# EXHIBIT 1

**V I R G I N I A:**                                                                                    **SPS**

## IN THE CIRCUIT COURT OF FAIRFAX COUNTY

Noah Nathan
     **Plaintiff**                                              CL-2011-0016352
**VS**                                                                      Subtype : Complaint

Takeda Pharmaceuticals America Inc, etal.
     **Defendant**

---

STATE OF _____

CITY/COUNTY OF _____, to wit:

    This day _____

personally appeared before the undersigned Notary Public in and for the City/County and State

aforesaid, and, having been first duly sworn according to law, disposes and states as follows:

that he/she is not a party to, or otherwise interested in, the subject matter in controversy in the

within cause, that he/she is over the age of 18 years; that on the _____ day of _____,

200_, at _____ o'clock _____.m. he/she served the within Complaint, in person, on the

Defendant _____ at _____

_____

_____ and the Defendant is / is not a

resident of the State of Virginia.

                                              _____
                                            AFFIANT               TITLE

     Subscribed and sworn to before me in my City/County and State aforesaid, this
_____ day of _____, 20____.

_____     Notary ID #: _____
          NOTARY PUBLIC         My Commission expires:_____

SPS

COMMONWEALTH OF VIRGINIA
**CIRCUIT COURT OF FAIRFAX COUNTY**
4110 CHAIN BRIDGE ROAD
FAIRFAX, VIRGINIA 22030
703-691-7320
(Press 3, Press 1)

Noah Nathan vs. Takeda Pharmaceuticals America Inc, etal.

CL-2011-0016352

---

TO:   Takeda Pharmaceuticals America Inc
One Takeda Parkway
Deerfield IL     60015

## SUMMONS –CIVIL ACTION

The party upon whom this summons and the attached complaint are served is hereby
notified that unless within  21 days after such service, response is made by filing in the
Clerk's office of this Court a pleading in writing, in proper legal form, the allegations and
charges may be taken as admitted and the court may enter an order, judgment or decree
against such party either by default or after hearing evidence.

**APPEARANCE IN PERSON IS NOT REQUIRED BY THIS SUMMONS.**

Done in the name of the Commonwealth of Virginia, on Monday, November 28, 2011.

JOHN T. FREY, CLERK

By: _____
**Deputy Clerk**

**Plaintiff's Attorney**  Christian B. Nagel

VIRGINIA:

FILED
CIVIL INTAKE

IN THE FAIRFAX COUNTY CIRCUIT COURT NOV 17  PM 3:49

JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

|  |  |
|---|---|
| NOAH NATHAN<br>10011 Whidbey Lane<br>Burke, Virginia 22015<br><br>    Plaintiff,<br><br>    v.<br><br>TAKEDA PHARMACEUTICALS<br>  AMERICA, INC.<br>One Takeda Parkway<br>Deerfield, Illinois 60015<br><br>Serve: CT Corporation System<br>      Registered Agent<br>      4701 Cox Road, Suite 301<br>      Glen Allen, Virginia 23060<br><br>  and<br><br>TAKEDA PHARMACEUTICALS<br>  NORTH AMERICA, INC.<br>One Takeda Parkway<br>Deerfield, Illinois 60015<br><br>Serve: Secretary of the Commonwealth<br>      1111 East Broad Street, 4th Floor<br>      Richmond, Virginia 23219<br><br>    Defendants. | **COMPLAINT**<br><br>CL No. 2011 -<br><br>**2011 16352** |

## COMPLAINT

COMES NOW THE PLAINTIFF, NOAH NATHAN, by counsel, and moves this

Court for entry of judgment in his favor, and against the defendants, TAKEDA

PHARMACEUTICALS NORTH AMERICA, INC., and TAKEDA

PHARMACEUTICALS AMERICA, INC., jointly and severally, and in support of such

complaint alleges and avers as follows:

## NATURE OF ACTION

1.     This is a civil action alleging discrimination, harassment, and retaliation in

violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act

of 1991, 42 U.S.C. § 2000(e) et seq.

## THE PARTIES

2.     The Plaintiff, Noah Nathan ("Mr. Nathan"), is a resident and citizen of

Fairfax County in the Commonwealth of Virginia.

3.     Takeda Pharmaceuticals North America, Inc. is a Delaware corporation

registered to do business and in good standing in the Commonwealth of Virginia, with its

principal offices located in a state other than the Commonwealth of Virginia.

4.     Takeda Pharmaceuticals America, Inc. is a Delaware corporation registered

to do business and in good standing in the Commonwealth of Virginia, with its principal

offices located in a state other than the Commonwealth of Virginia.

5.     Takeda Pharmaceuticals North America, Inc. and Takeda Pharmaceuticals

America, Inc. (collectively "Takeda" or the "Company") manufacture, distribute and

market pharmaceutical drugs.

6.     At all times material hereto, Takeda employed more than fifteen people.

Specifically, Takeda has approximately 6000 employees in locations throughout the United

States.

2

7.      At all times relevant hereto, Defendant Takeda acted as an "employer" within the meaning of the law at issue in this suit and is accordingly subject to the provisions of said law.

8.      At all times relevant hereto, Plaintiff Noah Nathan was an "employee" of Defendants within the meaning of the law at issue in this suit and is accordingly entitled to the protections of said law.

## JURISDICTION

9.      This Court has jurisdiction over Mr. Nathan's claims pursuant to the Court's concurrent jurisdiction over claims arising under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq.

10.     The amount in controversy exceeds the jurisdictional minimum amount for this Court.

11.     Takeda is present in and regularly conducts business in the County of Fairfax in the Commonwealth of Virginia, and maintains a registered agent for the service of process in the Commonwealth of Virginia.

12.     Takeda is subject to personal jurisdiction of this Court pursuant to Va. Code § 8.01-328.1 (A)(1), (2), (3), & (4).

13.     All conditions precedent to the institution of this suit have been fulfilled. On August 19, 2011, the United States Equal Employment Opportunity Commission issued a Notice of Right to Sue in this matter. This action has been filed within 90 days of receipt of said Notice.

## VENUE

14.     Takeda is present in and regularly conducts affairs and business activities in Fairfax County in the Commonwealth of Virginia, promoting its pharmaceutical products throughout the Commonwealth of Virginia and conducting other business in Virginia.

15.     Some acts in violation of Title VII alleged to have been engaged in, as well as the resultant injury, occurred in the Commonwealth of Virginia.

16.     Injury to Mr. Nathan, as well as several of the discriminatory and retaliatory acts at issue occurred in Fairfax County in the Commonwealth of Virginia. Mr. Nathan performs the majority of his work for Takeda in Fairfax County, Virginia.

## BACKGROUND

17.     Mr. Nathan began his employment with Takeda in 2002 and was initially hired as a primary care sales representative for a company that was a predecessor to Takeda.

18.     Prior to joining Takeda, Mr. Nathan had significant experience in pharmaceutical sales.

19.     Mr. Nathan has an exemplary record of performance at Takeda.  Prior to the events detailed below, Mr. Nathan received consistently positive performance evaluations at Takeda.  In addition, Mr. Nathan has been the recipient of several awards, including an award and overseas trip given to the top 10 percent of sales performers and an award given to the top 20 percent of sales performers.

20.     In or about 2004, Mr. Nathan was promoted to a position as a specialty sales representative.  As a specialty sales representative Mr. Nathan devoted the majority of his time to visiting various medical offices in his territory and providing health care

professionals in specialty offices with information about medications manufactured by Takeda.

21.     During the relevant time period, Mr. Nathan's position included promoting several Takeda drugs, including Uloric and Kapidex.

22.     Mr. Nathan and other specialty sales representatives work "in the field" and from their home offices, communicating with their management primarily through email and telephone conversations.  In addition, Mr. Nathan and other representatives periodically participate in "ride along" days with their district managers, during which managers spend the day with sales representatives in their territory, traveling with them to medical offices and observing their interactions with health care professionals.

23.     Sales representatives in Mr. Nathan's position typically have discretion with their schedules, and modify their schedules according to the hours and availability of the medical offices in their territories and other factors.   Mr. Nathan and others also typically spend significant time in their home offices completing administrative work.

24.     Mr. Nathan's performance is measured by the number of prescriptions written by doctors in his territory for the Takeda drugs that he promotes as well as by the sales efforts made by Mr. Nathan to achieve those results, which include things such as calculation of the number of visits or calls made to health care providers and the number of "details" or product discussions engaged in during these visits.

25.     Mr. Nathan has consistently delivered exemplary sales results for Takeda. For example, for the fourth quarter of fiscal year 2008, Mr. Nathan's sales overall rank was 3rd in the nation and 1st in his region, out of approximately 250 specialty sales representatives.

26.     From the beginning of the fiscal year 2009 through November 2009, the time period during which many of the events alleged in this Complaint transpired, Mr. Nathan was ranked 15th in the nation and 6th in his region.

27.     Mr. Nathan achieved these results by putting forth an outstanding effort on behalf of Takeda, an effort which is confirmed by an objective review of Mr. Nathan's sales efforts, including Mr. Nathan's call and detail volume, in comparison to those of his coworkers.

28.     In 2007, after Mr. Nathan's then district manager, Michael Venanzi, was transferred to another area, Michael Fouchie became Mr. Nathan's district manager.

29.     Mr. Fouchie has a history of abusing employees under his supervision and of inappropriately and unfairly punishing anyone who disagrees with him.

30.     Beginning in November 2008 and continuing through April 2009 Mr. Fouchie and Mr. Nathan had an ongoing dispute regarding the time Mr. Nathan should be "in the field," or in his territory, each day.  Contrary to Takeda's company practices and the standards enforced on other sales representatives, Mr. Nathan was told by Mr. Fouchie that he had to be "in the field" at 8:00 a.m., irrespective of when the offices in Mr. Nathan's territory opened and the physicians were available.

31.     Mr. Nathan shared with Mr. Fouchie that on mornings when he did not have a scheduled breakfast or program at a medical office he dropped off his son at his school, which is located in Mr. Nathan's territory, at 8:30 a.m. and then proceeded to call on offices. Mr. Nathan made clear to Mr. Fouchie that he was spending a full day "in the field" and additional time working at his home office.

32.     Mr. Fouchie criticized Mr. Nathan for this and questioned why Mr. Nathan's wife could not assume these child care responsibilities.

33.     Mr. Fouchie discriminated against Mr. Nathan based on his sex, treating him differently because of a stereotypical belief regarding appropriate general roles and family responsibilities – specifically that Mr. Nathan's spouse should assume the child care duties for their sons.

34.     In February 2009, Mr. Nathan attended a national company meeting related to the launch of two new Takeda products, Uloric and Kapidex.  When he returned from that meeting, Mr. Fouchie continued to pressure Mr. Nathan regarding his start time in the field and claimed that he would need to be recertified on one of the new drugs that he would be promoting, Uloric.

35.     Mr. Fouchie indicated that Louis Savant, Regional Sales Manager, had directed Mr. Fouchie to recertify Mr. Nathan on Uloric.

36.     Because Mr. Nathan believed that Mr. Fouchie was harassing him based on sex, treating him differently because of a stereotypical belief regarding appropriate sex roles and family responsibilities, Mr. Nathan complained to Mr. Fouchie and later to the Regional Human Resources Manager, Casandra Smith.

37.     On or about February 9, 2009, Mr. Nathan told Ms. Smith that he believed that Mr. Fouchie's actions were discriminatory and abusive.  However, Ms. Smith was completely unreceptive to Mr. Nathan's complaints regarding Mr. Fouchie.  In fact, Ms. Smith refused to contact other sales representatives in Mr. Fouchie's area to assist in investigating Mr. Nathan's complaints and advised him only to contact her once he had completed his recertifications.

38.     Following Mr. Nathan's complaint to Ms. Smith regarding the

discriminatory treatment and harassment he was receiving from Mr. Fouchie, Mr. Savant,

Mr. Fouchie and Ms. Smith began a campaign to harass and retaliate against Mr. Nathan

and remove him from his position as a Specialty Sales Representative.

39.     Mr. Fouchie and Mr. Savant, with the support of Ms. Smith, harassed Mr.

Nathan and created false records of fictitious performance deficiencies in an effort punish

Mr. Nathan for complaining about Mr. Fouchie and remove Mr. Nathan from his position

at Takeda. These efforts were later joined by John Flood, Manager of Specialty Sales

Training, and Michael Venanzi, District Sales Manager.

40.     On February 11, 2009, Mr. Fouchie contacted Mr. Nathan after the close of

business and requested that Mr. Nathan meet with him the next day at 7:00 am at a location

outside of his territory. Mr. Fouchie, in an apparent effort to "catch" Mr. Nathan doing

something wrong, also asked Mr. Nathan if he had a package insert which the entire sales

force had been directed to shred and not retain.

41.     On February 12, 2009, Mr. Fouchie met with Mr. Nathan and Mr. Nathan

passed the Uloric drug recertification.

42.     Shortly thereafter, Mr. Nathan spoke with Mr. Savant, who claimed that he

had requested a recertification for Mr. Nathan because a regional manager told him there

were concerns about his performance during one of the role-plays during the national

company meeting in February. Notably, Mr. Nathan did not participate in any role-plays

with any regional managers during the February company meeting.

43.     Approximately one week later, Mr. Savant contacted Mr. Nathan about the

complaint he had lodged with the human resources department. Mr. Savant advised Mr.

Nathan that Mr. Fouchie had not handled things well, but really did have Mr. Nathan's best

interests at heart. Mr. Savant further stated that Mr. Fouchie had been counseled about the

situation, specifically about directing Mr. Nathan to meet him at 7:00 a.m. at a location

outside of his territory.

44.     Mr. Savant then advised Mr. Nathan that he had decided to ride with Mr.

Nathan March 4, 2009, something he had never done previously.

45.     During this ride along, Mr. Savant was extremely antagonistic.

46.     On March 6, 2009 Mr. Savant and Mr. Nathan discussed the March 4, 2009

ride along during a telephone conference. During the conference Mr. Savant ignored all of

the positive things that happened on March 4, 2009, raising only criticisms. Mr. Savant

claimed during the conference call that Mr. Nathan had failed to repeat that Kapidex has a

"dual delayed release technology," when in fact Mr. Nathan repeated this key phrase

throughout the day. During this telephone call, Mr. Savant also informed Mr. Nathan that

he would receive a coaching letter at a later date and that he must be recertified on both

Uloric and Kapidex with Mr. Fouchie the following Monday.

47.     The coaching letter that Mr. Nathan received from Mr. Savant was filled

with false statements concerning Mr. Nathan's performance on March 4, 2009.

48.     Mr. Savant's report falsely stated that Mr. Nathan "did not meet

expectations for a number of MSF sales representative competencies" and "did not

demonstrate an understanding of our Kapidex strategies or adequate proficiency in

representing Kapidex to health care professionals and their staff."

49.     Mr. Savant also falsely stated that "[t]he purpose of this information is to

make you aware of your areas of improvement and provide examples of what we expect in

order for you to meet expectations," when in fact Mr. Savant's purpose was to harass Mr. Nathan.

50. Mr. Savant also provided a false justification for Takeda's decision to require Mr. Nathan to undergo recertification for both drugs: "The reason for this step is from your manager's assessment that you are still not able to meet expectations after several hours of one-on-one coaching on February 9, 2009."

51. Mr. Savant's report also falsely stated that Mr. Nathan had "failed to meet" the expectation of "being in your territory and actively calling on healthcare professionals a complete day." Mr. Savant criticized Mr. Nathan for "ending the day early" despite the fact that Mr. Nathan had met Mr. Savant at 7:45 a.m. and had stopped beforehand to pick up breakfast for the medical office they were visiting. When Mr. Savant and Mr. Nathan parted, it was approximately 4:00 p.m., more than eight hours later and they had completed all of the calls on Mr. Nathan's routing for the day.

52. During Mr. Nathan's ride along with Mr. Savant, Mr. Nathan made a total of 14 calls, of which 12 were detail calls, significantly in excess of the company expectation that a representative average six to seven detail calls per day.

53. Mr. Savant's report also listed numerous other alleged deficiencies containing false statements and observations which gave a false impression of Mr. Nathan's performance regarding the events of March 4, including, "When Noah presented the first of the five core Takeda messages he did not include key verbiage per company strategy and training;" "When presenting the two convenience programs Takeda has launched with Kapidex Noah did not explain it in a simple and persuasive way;" "Noah did not concisely articulate that the [convenience] program did not require any action on the

part of the HCP or their office;" "I did not observe Noah closing sales calls with effective closing questions;" "I also did not observe Noah asking HCP's how he could help them remember to write for Kapidex;" "Noah did not utilize branded materials or consistently leave them behind;" "…Noah again did not initiate any product discussions with staff members;" and "Noah did not attempt to get to know staff."

54.     Following Mr. Nathan's ride along with Mr. Savant, Mr. Savant, Mr. Fouchie and other Takeda officials escalated their efforts against Mr. Nathan, going to great lengths to make it appear as though Mr. Nathan lacked the necessary skills to continue as a specialty sales representative, when in fact Mr. Nathan was exceeding expectations as a sales representative.

55.     On March 9, 2009, Mr. Nathan met with Mr. Fouchie for his recertification on Uloric and Kapidex. Despite the fact that Mr. Fouchie had already certified Mr. Nathan once on Kapidex (at the national company meeting in February) and twice on Uloric (at the national company meeting and again on February 12, 2009), Mr. Fouchie now found Mr. Nathan's product knowledge deficient and refused to recertify Mr. Nathan on either drug.

56.     During Mr. Nathan's meeting with Mr. Fouchie on March 9, Mr. Fouchie only met with Mr. Nathan briefly, informed him that his understanding of the material was lacking, and spent most of their brief time together stepping out of the car to call Mr. Savant on his cell phone.

57.     Mr. Nathan was then instructed to go with Mr. Fouchie to a hotel to work on both products and he was told later that day that he would be flying to Chicago the following day for additional training.

11

58.     Mr. Nathan arrived in Chicago on March 10, 2009 for additional training scheduled to take place the next morning. The expectation was that he would spend the day with trainers and then would be recertified by Mr. Flood.

59.     Notably, Mr. Flood's attitude toward Mr. Nathan was extremely confrontational and Mr. Flood took steps to prevent Mr. Nathan from being recertified. For example, Mr. Flood questioned Mr. Nathan about issues on which he had not been trained. Mr. Flood would tell Mr. Nathan to do something and then after Mr. Nathan incorporated this feedback Mr. Flood would tell Mr. Nathan do so something entirely different. Mr. Flood also used an unusually expansive evaluation form for Mr. Nathan, which was different from the form used to certify Mr. Nathan both before and after his recertification in Chicago.

60.     Mr. Flood had been a direct report of Mr. Savant immediately prior to accepting his current training position.

61.     Mr. Savant took steps to influence Mr. Flood and encourage Mr. Flood to produce a negative evaluation of Mr. Nathan's performance in Chicago.

62.     Mr. Flood ultimately determined that Mr. Nathan would be recertified on Kapidex, but not on Uloric.

63.     Mr. Flood completed an evaluation relating to Mr. Nathan's March 10, 2009 recertification in Chicago. This evaluation contained several false and defamatory statements regarding Mr. Nathan.

64.     Mr. Flood's March 10, 2009 evaluation falsely stated that Mr. Nathan "Initially lacked enthusiasm and urgency of launch call," "Demonstrated very low impact

and very little enthusiasm," and that with respect to closing he "lacked impact and enthusiasm."

65.    Mr. Flood's March 10, 2009 evaluation also falsely stated that Mr. Nathan lacked skill in the areas of customizing calls for physicians depending on specialty and asking questions to gain physician's interest.

66.    Mr. Flood's March 10, 2009 evaluation also falsely stated that Mr. Nathan was "Unable to articulate key selling ideas" and lacked knowledge regarding adverse drug events.

67.    Mr. Flood's March 10, 2009 evaluation falsely stated that Mr. Nathan showed "strong resistance to coaching and feedback" and was "slow to adopt feedback."

68.    Mr. Flood's March 10, 2009 evaluation falsely stated that Mr. Nathan had a "strong need to improve clinical proficiency" and that Mr. Nathan needed to "become proficient in the use of all sales aids" and had "insufficient clinical knowledge."

69.    Mr. Nathan was then scheduled to ride with Mr. Fouchie on March 17, 2009 and March 18, 2009.  On March 19, 2009, Mr. Nathan received a ride report from Mr. Fouchie that was extremely critical of Mr. Nathan's performance during the ride along. Mr. Fouchie's report of his ride along with Mr. Nathan is filled with false statements.

70.    In his report, Mr. Fouchie claimed that "Many of the things I saw during our 2 days together were not consistent and below expectations of how a Medical Specialty Representative should represent themselves and Takeda Pharmaceuticals among the medical community" and listed numerous "instances where you did not use sound professional judgment while calling on offices."

71.    Mr. Fouchie's report falsely stated and implied that Mr. Nathan had been

disrespectful and inconsiderate and made doctors, nurses and patients uncomfortable when visiting medical offices.

72.     Mr. Fouchie's report also falsely stated that Mr. Nathan had failed to appropriately manage his territory resulting in a failure to visit offices during optimal times.

73.     Mr. Fouchie falsely claimed that Mr. Nathan was "defensive" "not receptive" and "dismissive " toward Mr. Fouchie's coaching, stating that Mr. Nathan "did not incorporate any of the coaching points" in subsequent calls.

74.     Mr. Fouchie falsely claimed that Mr. Nathan lacked initiative, claiming that Mr. Nathan had failed to learn the names of medical personnel and had failed to identify and pursue important opportunities.

75.     Mr. Fouchie's field report also falsely implied that Mr. Nathan lacked professionalism and had engaged in actions which could result in losing access to medical offices, stating that "From this point forward, it is expected that you represent Takeda with utmost professionalism when promoting Takeda products. Your behavior and how you handle yourself reflects on Takeda positively or negatively.  The actions and inactions I observed, if continued, can prevent you from gaining access to those offices in the future and result in the inability to promote Takeda products there."

76.     Mr. Fouchie's report falsely stated that Mr. Nathan failed to accurately deliver clinical information regarding the drugs he was promoting.

77.     Mr. Fouchie's report maliciously criticized Mr. Nathan's selling skills and falsely stated that Mr. Nathan "demonstrated a self centered check the box mentality that brought very little value to your customers and delivered selling messages in a didactic

manner with low engagement from customers."

78.     On March 19, 2009, Mr. Nathan received a call from Mr. Savant notifying him that he would need to go to New Jersey on March 23 for additional training, that after the training Mr. Savant would determine whether to recertify him on Uloric, and that if he was not recertified, he would be terminated from the company.  Mr. Nathan was further told that he would have to meet Mr. Fouchie the next morning to sign a letter acknowledging these facts.

79.     Mr. Nathan repeatedly sought Ms. Smith's intervention regarding the mistreatment from Mr. Fouchie and Mr. Savant and their actions regarding his recertifications, but Ms. Smith refused to assist Mr. Nathan.

80.     Instead of assisting Mr. Nathan, Ms. Smith repeated and supported the defamatory statements made by Mr. Fouchie, Mr. Savant and Mr. Flood, despite her knowledge that these statements were false.

81.     On March 19, 2009, after Ms. Smith ignored numerous telephone calls from Mr. Nathan, Mr. Nathan wrote to Ms. Smith expressing concerns about Mr. Fouchie's ride report and the harassment that he was suffering.  On the same day, after learning about the March 23, 2009 recertification, Mr. Nathan submitted a written request to Ms. Smith, that the recertification be conducted by a third party who had not been involved in the prior recertifications and who did not have knowledge of the events that had previously transpired.

82.     Only after Mr. Nathan's written request (which carbon copied two senior Company executives, both of whom are attorneys) did Ms. Smith contact Mr. Nathan to inform him that the process in New Jersey would be fair, and that the recertification would

be conducted by someone without any knowledge of the events that had transpired. Notably, Ms. Smith chastised Mr. Nathan for sending a copy of his March 19 correspondence to the two Company attorneys, and directed that Mr. Nathan refrain from communicating with these attorneys in the future.

83.     On March 20, 2009, Mr. Nathan met with Mr. Fouchie and was presented with a "Warning" letter dated March 19, 2009 from Mr. Fouchie which contained several false statements relating to Mr. Nathan's product knowledge and his need for recertification.  For example, the letter stated that "...[O]n March 4, 2009, you were observed as having a lack of understanding of Kapidex marketing strategies and lacking the required proficiency in presenting Kapidex to healthcare professionals and their staff." The letter also falsely stated that during his Chicago recertification Mr. Nathan "did not meet the Uloric certification standards articulated during the Uloric launch training."

84.     Notably, the March 19, 2009 letter stated that the basis for requiring Mr. Nathan to be recertified was the "lack of understanding" regarding Kapidex that Mr. Nathan displayed on March 4, 2009, during his ride along with Mr. Savant, rather than the alleged deficiencies that Mr. Nathan supposedly displayed to an unknown regional manager at the February national sales meeting.

85.     The March 19, 2009 letter advised Mr. Nathan that he will have "one final opportunity" to be recertified in New Jersey on March 23, 2009 and that if he is not able to meet the certification requirements his "employment with Takeda will be terminated immediately."

86.     The events surrounding Mr. Nathan's recertification in New Jersey in March 23, 2009, were highly suspicious for a number of reasons.

87.     Mr. Nathan met with a regional trainer, Liz Matakitis, in the morning in New Jersey. After an initial role-play, Ms. Matakitis informed Mr. Nathan that his performance was already "passable" based on the criteria used at the company meeting in February.

88.     Nonetheless, they proceeded to engage in several more hours of additional training as scheduled.

89.     Later that afternoon, Ms. Matakitis and Mr. Nathan traveled to the regional office in New Jersey for Mr. Nathan's recertification with Regional Director Ron Smith. Upon entering the parking lot of the regional office, Mr. Nathan and the regional trainer observed all of the managers who reported directly to Mr. Savant, with the exception of Mr. Fouchie, exit the building.

90.     Based upon this observation and other knowledge, Mr. Nathan believes that Mr. Fouchie and Mr. Savant were both present in the New Jersey office during his recertification and that despite assurances to the contrary, they consulted with the regional director immediately prior to Mr. Nathan's recertification.

91.     After entering the New Jersey office, Ms. Matakitis left to get Mr. Smith to conduct the recertification. Mr. Smith then exited Mr. Savant's office, and proceeded to begin the recertification without Ms. Matakitis being present, despite the fact that Mr. Nathan had specifically been assured in writing that the regional trainer would be present for the recertification.

92.     Although Ms. Smith had assured Mr. Nathan that the recertification would be fair, and conducted by an individual who was completely neutral and unaware of the

17

events that had transpired, Mr. Smith was in Mr. Savant's office immediately prior to the recertification.

93.    After his recertification Mr. Smith refused to tell Mr. Nathan whether he had passed.  Moreover, Mr. Smith exited the conference room where the recertification took place, and proceeded to return immediately to Mr. Savant's office.  Only after several hours and numerous calls to Ms. Smith was Mr. Nathan eventually informed that he had passed the recertification.

94.    Mr. Nathan relayed to Ms. Smith his concern regarding the irregularities which occurred at the New Jersey recertification, but Ms. Smith dismissed his concerns, stating that they were irrelevant since Mr. Nathan ultimately passed the recertification.

95.    On March 25, 2009 Mr. Nathan spoke with Ms. Smith for approximately two hours regarding his concerns including his initial complaints regarding discrimination and harassment; his concerns regarding the coaching letter from Mr. Savant and the ride report from Mr. Fouchie; his concerns regarding the Chicago training; and his concerns regarding the irregularities at the New Jersey recertification.

96.    In May 2009, more than six weeks after Mr. Nathan was recertified in New Jersey, and almost three months after Mr. Nathan's original complaint, Ms. Smith told Mr. Nathan that she had completed her investigation and concluded that there was no evidence of any wrongdoing.

97.    Although Ms. Smith had vowed that she would investigate Mr. Nathan's allegations, Ms. Smith actually did little (or nothing) beyond speaking with Mr. Savant, Mr. Fouchie, Mr. Flood and Mr. Smith.  When Mr. Nathan asked if she had spoken with

any of the other representatives in his district, Ms. Smith responded "no" and appeared offended that Mr. Nathan would ask that question.

98.    On July 15, 2009, Mr. Nathan received his 2008 performance evaluation. This performance evaluation was transmitted to Mr. Nathan through Takeda's employment counsel, indicating that the evaluation was reviewed and approved by Takeda executive management.

99.    Although Mr. Nathan was ranked highly in sales for the relevant time period, he received a performance evaluation with the lowest ratings of "1" and "2" on a scale of 1-5 in all categories. These low ratings were then combined with Mr. Nathan's sales performance and resulted in Mr. Nathan receiving an overall rating of "3," despite his exemplary sales performance throughout the year.

100.    The performance evaluation contains numerous false and defamatory statements regarding Mr. Nathan's performance.

101.    The performance evaluation falsely stated that Mr. Nathan's performance was lacking in the area of Leadership, and that Mr. Nathan: "inconsistently applies the Takeda selling model. He infrequently utilizes visual aids and marketing pieces. Noah inconsistently delivers brand messages as expected. Noah seldom initiates the sharing of ideas and feedback on business strategies and tactics with peers and DM's [District Managers]."

102.    The performance evaluation further falsely stated that Mr. Nathan's performance was lacking in the areas of Teamwork/Collaboration, and that: "Noah seldom initiates communication with partner reps, RAM's [Regional Account Managers] and overlay DM's [District Managers]. Noah seldom provides written updates on key account

activities to partners and is not proactive in reaching out to partners for developing local strategies."

103. The performance evaluation falsely stated that Mr. Nathan's performance was lacking in the area of Results Driven, and that Mr. Nathan: "Doesn't demonstrate thorough knowledge of strategy outside of MCO coverage for Prevacid. Has not demonstrated an understanding of Kapidex/Uloric strategy & selling tactics and has been observed during ride days and follow up training efforts to have low proficiency levels."

104. The performance evaluation falsely stated that Mr. Nathan's performance was lacking in the area of Managing Change, and that Mr. Nathan showed: "Little evidence of proactively seeking feedback to improve in developmental areas. Has demonstrated a pattern of being resistant to feedback and suggestions for improvement in developmental areas."

105. The performance evaluation falsely stated that Mr. Nathan's performance was lacking in the area of Business Acumen, and that Mr. Nathan: "...show[s] inconsistency in executing expected strategies outside of managed care pull through and dosing and administration messages."

106. The performance evaluation falsely stated that Mr. Nathan's performance was lacking in the area of Self-Awareness, and that Mr. Nathan: "Seldom seeks feedback to enhance performance. Does not adapt behavior in response to feedback. There is little evidence of self-assessment and self-development to improve specific skills and competencies. Restraint to feedback and changing behaviors."

107. The performance evaluation falsely stated that Mr. Nathan's performance was lacking in the area of Technical/Functional Expertise, and that Mr. Nathan: "has not

demonstrated a thorough understanding of customer needs or call activity expectations. He demonstrated low evidence of utilizing resources and marketing aids. Additionally, Noah struggled to demonstrate a high level of disease state knowledge for new products."

108.    The summary comments in Mr. Nathan's performance evaluation provided a false and misleading summation of Mr. Nathan's performance: "For Takeda Competencies, Noah demonstrates low proficiency for a Senior Sales Representative in several important areas. He also failed to meet 2008 Sales Force expectations in other areas such as call reach and frequency with high potential customers and communication/coordination with partner reps and managers. Noah does not optimize office availability of key HCPs [Health Care Providers]. Many calls only resulted in sample signature interactions."

109.    Following his receipt of his performance evaluation, Mr. Nathan filed a Charge of Discrimination with the Equal Employment Opportunity Commission on July 17, 2009, and notified Takeda management in writing, including but not limited to Michael Venanzi and Louis Savant, that he had filed this charge.

110.    In June 2009, after Mr. Nathan's attorneys contacted Takeda's legal department, Mr. Nathan was transferred from Mr. Fouchie's district to the supervision of another district manager, Michael Venanzi. Mr. Venanzi had also served as Mr. Nathan's supervisor previously and they had enjoyed a positive working relationship.

111.    Despite the positive relationship Mr. Nathan had previously enjoyed with Mr. Venanzi, after Mr. Nathan raised concerns to Mr. Venanzi concerning his performance review, Mr. Venanzi consulted with Takeda's human resources department, and following the filing of Mr. Nathan's EEOC Charge, Mr. Venanzi began to treat Mr. Nathan

21

differently.

112.   For example, Mr. Venanzi spent the day observing Mr. Nathan on July 7, 2009, and submitted a field report to Mr. Nathan that was drastically different from the field reports he had previously prepared for Mr. Nathan. Mr. Venanzi's July 2009 Field report, which was provided to Mr. Nathan on July 21, 2009, contained several inaccurate, defamatory and retaliatory statements regarding Mr. Nathan's performance. For example, Mr. Venanzi's report falsely stated that Mr. Nathan had trouble seeing physicians.

113.   Echoing Mr. Fouchie's unjustified criticism of Mr. Nathan, Mr. Venanzi also falsely criticized Mr. Nathan's communications with his colleagues, stating, "We also talked about your communication with your counterparts and your overlay DM's [District Managers] and specialists. I was a bit taken back by your not knowing all of your overlays and not being aware of who some of your specialty representatives are. I will chalk that up to being nervous on our first call. As I had said during our ride day, communication is very important with your partners. Please make it a point to identify all of your supporting members, managed care support, DM's of all types, clinical specialists, and anyone else who can help you make an impact in this territory. I will be sending you an example of what great communication looks like from another territory."

114.   On August 9, 2010, Mr. Nathan's current manager, Noelle Breuker, gave Mr. Nathan a performance evaluation for 2009 prepared by Mr. Venanzi. The performance evaluation contains numerous false and defamatory statements regarding Mr. Nathan's performance.

115.   The performance evaluation falsely stated that Mr. Nathan's performance was lacking in the area of Leadership, rating his performance a "2" (below expectations)

and stating that "Noah is capable of taking a leadership role within the group.  However, he tends to stay detached unless he has a clear stake in the issue." The Leadership section of the evaluation also includes the false statement that "Noah needs to make an effort to include the surrounding DM's more in strategy and implementation of goals."

116.    The performance evaluation also falsely stated that Mr. Nathan's performance was lacking in the area of Teamwork/Collaboration, rating his performance as a "2" in this area and stating that he needed "to reach out more to his supporting team members in the managed care and MPC Management team."

117.    The performance evaluation also falsely stated that Mr. Nathan's performance was lacking in the area of Business Acumen, rating his performance a "2" in this area and stating that, "Noah tends to use his relationships to [sic] much when making sales calls.  When in offices that Noah does not have as good a relationship the sales calls are much more challenging," and that he should be "more proactive about pursuing learning opportunities."

118.    The performance evaluation also falsely stated that Mr. Nathan's performance was lacking in the area of Technical Functional Expertise, rating his performance as a 2 in this area and stating that he needed "to use a sales aide on more calls," and "was slow to use [the product monograph] in the field."

119.    By the time of the August 2009 evaluation, Mr. Nathan had been working with Ms. Breuker for several months and Ms. Breuker expressed genuine surprise at the content of this evaluation, indicated that this was not her experience with regard to his performance, reiterated that this was not her own evaluation of his performance, and offered to assist Mr. Nathan if he wished to respond in some manner to the evaluation.

-23-

120.    The negative treatment and adverse employment actions detailed above were in retaliation for Mr. Nathan's legally protected assertion of his rights with respect to, his opposition to, and his complaining about, the discrimination and harassment he was subjected to.

121.    Takeda discriminated against and harassed Plaintiff Noah Nathan based on his sex and its stereotypical view of appropriate family responsibilities based on his sex, and retaliated against Plaintiff for complaining about this discrimination and harassment, in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq.

122.    As a result of discrimination, harassment, and retaliation suffered by Mr. Nathan, Mr. Nathan has suffered severe emotional distress.

123.    Members of Takeda's management acted with the intent of causing, or in reckless disregard of the probability that their actions would cause Mr. Nathan severe emotional distress.

124.    Members of Takeda's management engaged in conduct which was extreme and outrageous.

125.    Defendants' actions have also caused significant damage to Mr. Nathan's reputation and career prospects.

126.    For example, Takeda determined that because Mr. Nathan had received a formal "warning" on March 20, 2009, he was ineligible for certain employee benefits and opportunities.

127.    Specifically, in 2008 and 2009, Mr. Nathan enrolled in a Master's of Business Administration Program and participated in Takeda's Tuition Reimbursement

24

Program, which provides employees with a contractual right to reimbursement for tuition for approved programs.

128.    In May 2009, Ms. Smith informed Mr. Nathan that he would not be reimbursed by the Company for his tuition expenses of more than $4,300 for the semester he completed in April 2009. Ms. Smith stated that since Mr. Nathan had received a warning letter during the semester, he was ineligible for reimbursement. Ms. Smith further informed Mr. Nathan that he would not be eligible for tuition reimbursement for at least the next six months. In fact, Mr. Nathan was later denied another tuition reimbursement for the semester ending in July 2009, resulting in another loss of approximately $4,300 in tuition expenses.

129.    In addition, the warning in Mr. Nathan's file negatively affected his ability to seek promotions and other job changes and upon information and belief the warning in Mr. Nathan's file and the defamatory evaluations of his performance, which were motivated by retaliation for Mr. Nathan's complaints of discrimination, have resulted in smaller pay increases than what Mr. Nathan would otherwise have been entitled.

## COUNT ONE
### (TITLE VII OF THE CIVIL RIGHTS ACT OF 1964)

130.    The foregoing allegations are incorporated as if realleged herein.

131.    Based on the foregoing, the Defendants Takeda Pharmaceuticals North America, Inc. and Takeda Pharmaceuticals America, Inc. engaged in unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq.

132.    In treating Plaintiff Noah Nathan differently because of his sex and its stereotypical view of appropriate family responsibilities based on his sex, and in

25

retaliating against him for his complaints of discrimination and harassment, Defendants
violated Title VII.

133.    Said violations were intentional and willful.

134.    Said violations warrant the imposition of punitive damages.

135.    As a direct and proximate result of Takeda's actions, Mr. Nathan has
suffered injury, physical and emotional distress, pain, suffering, inconvenience, mental
anguish, loss of enjoyment of life, past and future loss of income, loss of benefits, lost
career and business opportunities and advancement, medical expenses, attorneys' fees and
costs, other past pecuniary losses, future pecuniary losses, and other nonpecuniary losses.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Noah Nathan respectfully requests that this Court enter
judgment in his favor and against Defendants:

a.    Declaring that the acts and practices complained of herein are in violation of
Title VII;

b.    Enjoining and restraining permanently the acts and practices complained of
herein;

c.    Awarding damages to Plaintiff to make Plaintiff whole for all past and
future lost earnings, benefits and earnings capacity which Plaintiff has
suffered and will continue to suffer as a result of Defendants'
discriminatory and retaliatory conduct;

d.    Awarding damages to Plaintiff for emotional upset, mental anguish,
humiliation, loss of life's pleasures and pain and suffering;

e.    Awarding punitive damages to Plaintiff;

f.  Awarding Plaintiff costs of this action together with reasonable attorneys' fees;

g.  Awarding Plaintiff such other damages as are appropriate under Title VII; and

h.  Granting such other relief as this Court deems just and proper.

**JURY DEMAND**

PLAINTIFF NOAH NATHAN DEMANDS A TRIAL BY JURY.

November 17, 2011                          Respectfully submitted,

Christian Nagel
Virginia Bar No. 79690
Fluet, Huber & Hoang PLLC
4000 Genesee Place, Suite 205
Lake Ridge, VA 22192
(703) 590-1234
(703) 590-0366 (fax)
cnagel@fluetlaw.com
*Counsel for Plaintiff,*
*Noah Nathan*