IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

NOAH NATHAN,                          )
                                      )
            Plaintiff,                )      Case No. 1:11-cv-1360 (AJT/TRJ)
                                      )
     v.                               )
                                      )
TAKEDA PHARMACEUTICALS                )
AMERICA, INC., et al.,                )
                                      )
            Defendants.               )
_____)

## MEMORANDUM OPINION

Plaintiff Noah Nathan ("Nathan") claims that because of his child-care duties, defendants Takeda Pharmaceuticals America, Inc. and Takeda Pharmaceuticals North America, Inc. (collectively referred to as "Takeda") discriminated against him and subjected him to a hostile work environment, and also retaliated against him for complaining about his mistreatment, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. This matter is before the Court on defendants' Motion for Summary Judgment. For the reasons stated herein, the Court grants defendants' motion.

## I.  FACTS.[1]

Nathan began his employment with Takeda in 2002 and became a specialty sales representative in 2004, the position he held at the time that Takeda engaged in the allegedly illegal conduct. As a specialty sale representative, his job was to promote the sale of Takeda pharmaceuticals to health professionals. As a part of his duties, he was required to spend most of

---

[1] Unless otherwise indicated, the facts stated herein are either undisputed or disputed facts viewed most favorably to Nathan and are taken primarily from (1) the joint statement of undisputed facts ("Stipulations"); (2) Takeda's statement of undisputed facts ("SUF"); and (3) Nathan's opposition statement of facts. The Court has noted those recited facts which Nathan has disputed without adequate support in the record.

his time visiting various medical offices in his territory in order to provide health care professionals with information about drugs that Takeda manufactures. For this reason, specialty sales representatives work "in the field" and also from their home offices.

Specialty sales representatives are supervised by district managers, who, among other activities, participate in "ride along" days where they accompany a sales representative during his customer visits in order to observe that representative's interactions with health care professionals. Takeda also requires its sales representatives to be "certified" by Takeda to sell its drugs, including each new drug that Takeda releases. Takeda provides training to sales representatives for that purpose, including a performance improvement plan (usually created in consultation with both the sales representative's District Manager, the Regional Manager, and the Human Resources department) when a sales representative does not meet expectations after a certain point in his training.

The events that give rise to Nathan's claims began in the latter half of 2008. At that time, Nathan's district manager was Michael Fouchie. Fouchie expected all of his representatives in his district to start their work day in the field at 8:00 a.m. However, under an arrangement with his wife, Nathan dropped his older child off at school Tuesday through Friday at 8:30 a.m., following which he would begin his work day. Def.'s Ex. C, at 105-06 ("Nathan Dep."); SUF 16. Fouchie occasionally commented critically to Nathan about his start times, but in November 2008 the criticism escalated. *Id.* at 106-07. During a conversation with Nathan about his start times on November 20, 2008, Fouchie learned that Nathan's tardiness was due to his child-care responsibilities four days per week. SUF 16. During that conversation, Fouchie told Nathan that starting his field work at 8:30 a.m. on a regular basis was not acceptable. *Id.* Fouchie also asked Nathan why his wife could not drop their older child off at school, a comment that became the

2

basis for Nathan's claims of gender discrimination. According to Nathan, Fouchie "had the attitude where it's the wife's job to do it, how come your wife can't do it," though Nathan does not point to any other actual statements by Fouchie to support that "attitude."

Nathan spoke with other sale representative supervised by Fouchie and found that Fouchie applied his start-time policy uniformly throughout his sales district.[2] Nathan Dep. 130-33. In fact, Fouchie had sent an email to the entire sales force in his district telling the sales representatives to start by 8:00 a.m. because he wanted to be able to boast that his sales representatives were in the field early. SUF 17.

Fouchie's comments to Nathan about Fouchie's start-time policy continued after November 20, 2008, but without any explicit reference to his wife. In an e-mail dated December 12, 2008, Fouchie told Nathan the following:

> I want to follow up on our conversation on November 20 about you having to start work after 8:30 am everyday because you have to drop off your child at school at 8:30 am since they started in a new school. I fully support work life balance and expect that you strive to achieve it. In my opinion consistently starting at 8:30 am is not reasonable and fair to Takeda or me.

> "The expectation is your first call of the day should be to an office within your routing that opens the earliest of that day . . . and the last call of the day should be to an office that closes the latest that day. . . ."

> Please communicate with me when you need to occasionally start late or finish early and I will support your reasonable requests. There are times when you need to start later and finish earlier. (i.e. Doctor and Dentist appointments or taking a child to doctor.)

---

[2] Some of the other sales representatives reporting to Fouchie had school-aged children as well, though Nathan was the only man in Fouchie's district who had young children and whose wife was also working. *See* Pl.'s Br. in Opp'n to Motion for S.J. 3 ("Pl.'s Opp'n"). Although Nathan disputes that Fouchie applied his 8:00 a.m. start-time policy uniformly throughout his district, he does not cite any facts that support that position and relies on nothing more than his subjective beliefs. *Compare* SUF 19 *with* Nathan Dep. 109; Pl.'s Ex. 21, at ¶ 6; Pl.'s Ex 24; Pl.'s Ex. 25; Pl.'s Ex 26, at 164.

3

Please help me understand what solution you have come up with to address your start times to put them in line with expectations; I want you to have some flexibility and appreciate your answering honestly when I asked about start times.

Let's find a solution that is a win for everyone. . . .

Nathan Dep. Ex. 7. The record contains no other specific exchanges over the start-time policy until two months later in February 2009.

On February 2, 2009, Nathan attended a national company meeting in Anaheim, California related to Takeda's market introduction of two new drugs: Uloric and Kapidex. Consistent with its established policy, Takeda required its entire sales force to be certified on Uloric and Kapidex. For that purpose, Takeda prepared sales materials on these drugs and the Anaheim meeting was devoted to certifying sales representatives on those two new drugs. Nathan participated in these certification exercises in Anaheim; and Fouchie certified Nathan on both drugs.[3] After the Anaheim meeting, Fouchie informed his supervisor, the Regional Sales Manager Louis Savant, that he had certified some of his sales representatives in Anaheim, but believed that Nathan and another sales representative required more training before selling Kapidex and Uloric.[4]

On February 9, 2009, Fouchie called Nathan, and in response to Fouchie's question, Nathan confirmed that he had the same arrangement for taking his older child to school in the morning. Nathan Dep. 127. That same day, Fouchie notified Takeda's training department that

---

[3] Takeda contends that "[a]lthough Fouchie certified Nathan in Anaheim, he informed him after the meeting that he needed additional training." SUF 23. Nathan claims that he was certified and that no one told him he would need additional training. Given its obligation to view the facts most favorably to Nathan, the Court will assume as correct Nathan's version of the facts in this respect for the purposes of the summary judgment motion.

[4] Nathan disputes that Fouchie made these statements to Savant. While there is sufficient evidence to create a factual dispute as to whether Fouchie told Nathan of his need for more training, *see supra* note 3, there is nothing in the record that properly raises any factual dispute as to whether Fouchie told Savant about Nathan's deficiencies.

he needed assistance with the certification of Nathan and another sales representative; [5] and later that same day, Fouchie told Nathan he needed to be recertified on Uloric. Also on February 9, 2009, following his conversation with Fouchie, Nathan contacted Cassandra Smith of Takeda's Human Resources Department ("HR") and complained that he was being discriminated against because of his family responsibilities.[6] Specifically, he complained that he was being singled out for failing to comply with morning start times because of his family responsibilities to take his children to school.

On February 11, 2009 around 5:00 p.m., Fouchie, by e-mail, directed Nathan to meet him the next morning at 7:00 a.m. for recertification exercises. Nathan forwarded that email to Smith as an "example of harassment I believe I am being subjected to." The next day, February 12, 2009, Fouchie and Nathan met and "role played," after which Fouchie certified Nathan on Uloric.

Around February 20, 2009, Fouchie and his Regional Sales Manager Savant learned of Nathan's complaint to HR. That same day, Savant sought out Fouchie to discuss with him his concerns. The substance of that meeting between Savant and Nathan is recounted in an e-mail dated February 20, 2009 from Savant to Smith, the accuracy of which is not challenged by Nathan. *See* Nathan Dep. 151-70 and Ex. 11. In that e-mail, Savant reported:

---

[5] Nathan disputes that Fouchie notified Takeda's training department on February 9, 2009 for assistance with certifying Nathan and another sales representative. The Court finds, however, that the evidence Nathan cites in support of his position does not create a factual dispute as to these facts. *Compare* SUF 25 *with* Pl.'s Opp'n Br. 3-4 nn. 8-9.

[6] The parties stipulated that Nathan first told Smith on February 9, 2009 that he believed he was being discriminated against. *See* Stipulations 15. However, the parties alternatively cite February 10, 2009 as the date of the initial complaint to Smith. *See* SUF 27; Pl.'s Opp'n 5. This discrepancy is immaterial, particularly because there is no dispute that Fouchie told Nathan of his decision to require additional training before Nathan complained to HR.

> I had a good conversation with Noah [Nathan].  He said that he feels much more comfortable and was glad he had an opportunity to discuss his situation with me.  I also spoke with Mike [Fouchie] about Noah's concerns and I told Noah I was going to do that. . . . I did thank Noah for contacting you [HR] and being willing to talk to me.  I told him it was my opinion from numerous conversations with Mike [Fouchie] that he has Noah's best interesting [sic, interests] in mind.  I told him I would talk to Mike and discuss Noah's concerns and that some of them are very appropriate.  Specifically, the way his certification was handled, the communication and scheduling of the 7 am meeting, and Mike's change to the vacation tracker form asking reps to specify if sick days were personal or for children.  We did have an extensive discussion about Noah's work day and Noah fully understands the expectations . . . .

Nathan Dep. Ex. 11.  Savant also reported on his conversation with Nathan pertaining to his need for more training:

> Noah did share more information about his experiences [in Anaheim].  He claims that he didn't role play with [a Regional Sales Director], but it was a home office trainer that may have rated him low.  I wish I still had my notes, but it is possible he is correct.  I did speak with other people about how the role plays went . . . .  I informed Noah that no person, including Mike said he was terrible.  However, I did have his name on my list for feedback of people that were not proficient to the level we wanted.  I shared with him my recollection of the feedback and <u>Noah did remember some things that he didn't do well</u>. I told Noah that after receiving Mike's feedback it was my decision to request that Mike get together with him again and make sure Noah was fully ready to do a great job.  Noah seemed to accept it, although I agreed it could have been handled much better.

Nathan Dep. Ex. 11 (emphasis added).  After his meeting with Savant, Nathan reported to HR that "I talked to Lou [Savant], everything sounds great, I'm feeling comfortable now, I think things are going to be positive going forward." Nathan Dep. 149.

During the February 20 meeting with Nathan, Savant proposed a "ride along" and Nathan agreed.[7]  The ride along took place on March 4, 2009; and two days later, on March 6, 2009,

---

[7] In his e-mail to HR, recounting his February 20 meeting with Nathan, Savant described the lead-up to the March 4 ride along as follows:

> Lastly, I did offer to ride with Noah when he felt comfortable to do that.  He said I can come any time and I scheduled a ride day for March 4.  I did ask him again to be sure he is OK with it and not to think I am singling him out.  He seemed eager to have me ride with him, so hopefully that's the case.

Savant called Nathan and told him that he needed additional training for certification in both Uloric and Kapidex. In a letter dated March 6, 2009 to Nathan, Savant listed the deficiencies he perceived in his ride along with Nathan and advised Nathan that he would be trained on both drugs at Takeda's training facility near Chicago, at the end of which Nathan would be evaluated for certification on Kapidex and Uloric. On March 9, 2009, Fouchie met at Savant's direction with Nathan for three hours of role play training but did not certify Nathan on either drug.

On March 11, 2009, Nathan attended the scheduled training session in Chicago, where Takeda trainer John Flood trained him on Kapidex and Uloric. Nathan passed the training requirements for Kapidex and was certified for that drug, but failed the training requirements for Uloric.[8] On March 13, 2009, Savant notified Nathan by email that he was not certified on Uloric.

On March 16 and 17, Fouchie rode along with Nathan, following which Fouchie sent Nathan a report critiquing Nathan's performance. On March 19, Nathan forwarded to HR Fouchie's ride along reports, complained about retaliation, and asked that his Uloric training be conducted or observed by a "neutral party." SUF 40; Pl.'s Opp'n 17, at ¶ 40. In response, Takeda arranged for Nathan to be trained and certified on Uloric in New Jersey. However, Nathan received a warning letter dated March 19, 2009, prepared by HR, but signed by Fouchie, in which Nathan was told that unless he successfully completed training as to Uloric at his upcoming training in New Jersey, he would be terminated. On March 23, 2009, Nathan trained in New Jersey, following which he was certified as to Uloric.

---

Nathan Dep. Ex. 11.

[8] In an email exchange with Flood, Savant requested Flood to clarify the reasons why Nathan had not been certified as to Uloric. See Pl.'s Ex. 44 ("I [Savant] just want it to be clear to HR that Noah [Nathan] is not meeting expectations for Uloric.").

The next day, March 24, 2009, Nathan again complained to HR that he was still being harassed and requested a transfer to another district. Two months later, Takeda granted Nathan's request to be transferred and reassigned him to a district supervised by Michael Venanzi, who had been Nathan's District Manager before Fouchie. Takeda did not tell Venanzi the specific reason for the transfer. SUF 45.

On May 15, 2009, HR informed Nathan that Takeda had completed its investigation into his February and March complaints and concluded that Nathan had not been retaliated against.

On July 7, 2009, Venanzi conducted his first ride along with Nathan. On or about July 15, 2009, Nathan received his 2008 performance evaluation, which was prepared by Fouchie and Savant. That evaluation gave Nathan an overall score of "3," which was consistent with his prior overall evaluation scores.[9]

On July 17, 2009, Nathan filed a charge with the Equal Employment Opportunities Commission ("EEOC"). Four days later, on July 21, 2009, Venanzi reported to Nathan his evaluation of his performance based on the July 7 ride along. In that report, Venanzi constructively criticized Nathan's sales techniques and gave him advice on how to improve those techniques.

A year later, in August 2010, Nathan was given his 2009 performance evaluation that Venanzi had prepared, which contained several "below expectations" ratings, something that had never occurred in Venanzi's previous evaluations of Nathan's work performance. Venanzi testified that he lowered performance ratings from his initial drafts based on conversations he had with Savant about Nathan's performance during the evaluation period before he was

---

[9] An initial draft of the evaluation had many scores of "1" and "2" and was the lowest evaluation that Smith of HR had ever seen. HR asked Fouchie and Savant to raise the grades, which ultimately led to the overall score of "3," though Fouchie and Savant unsuccessfully sought to give Nathan a "2."

assigned to Venanzi. Def.'s Ex. D, at 134-36 ("Venanzi Dep."). Nevertheless, Nathan received an overall performance rating of "3," the same overall score he received for every previous evaluation at Takeda.

Based upon these facts, Nathan claims that (1) he was discriminated against because of his status as a male caregiver, (2) he was subjected to a hostile work environment, and (3) he was retaliated against for engaging in "protected activity," which consisted of his complaints to HR and also his EEOC charge, all in violation of Title VII. The Court finds and concludes that Nathan has failed to raise a triable issue of material fact as to these claims and that Takeda is entitled to judgment on these claims as a matter of law.

## II. SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate only if the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996). The party seeking summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

9

judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in

original).  Whether a fact is considered "material" is determined by the substantive law, and

"[o]nly disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." *Id.* at 248.

The nonmoving party may rebut the motion for summary judgment "by any of the kinds

of evidentiary materials listed in Rule 56(c)." *Celotex,* 477 U.S. at 324.  To overcome a motion

for summary judgment, the nonmoving party "'may not rely merely on allegations or denials in

its own pleadings' but must 'set out specific facts showing a genuine issue for trial.'"

### III. ANALYSIS

Nathan seeks recovery under his one-count complaint for violation of Title VII based on

three different theories: (1) illegal discrimination based on sex; (2) hostile work environment;

and (3) illegal retaliation in response to protected activity.  The Court addresses each in turn

below.

#### A.  Discrimination

Based on the record before the Court, there is no direct evidence of discrimination against

Nathan.  The only direct evidence that Nathan points to in support of his discrimination claim is

Fouchie's statements to him on November 20, 2008 and February 9, 2009.  However, none of

those statements contained any disparaging remarks about male caregivers or proper gender

roles; and all of Nathan's beliefs in these respects are based on his subjective judgments,

inferences, and perceptions.  At most, viewed most favorably to Nathan, Fouchie's statements

reflect some general hostility toward child-care responsibilities and his view that job

responsibilities take priority over child-care responsibilities; but Fouchie's statements, even

when so viewed, do not constitute direct evidence of Nathan's discrimination claim. *See Samuels*

*v. City of Baltimore*, RDB 09-458, 2009 WL 3348134, at *5 (D. Md. 2009) ("While Title VII

does not protect against discrimination based on caregiving responsibility, it does prohibit

discrimination based on sex."); *O'Connor v. Consol. Coin Caterers Corp.*, 56 F.3d 542, 548 (4th

Cir. 1995) (stating that direct evidence "would prove the existence of a fact . . . without any

inference or presumptions."), *rev'd on other grounds, O'Connor v. Consol. Coin Caterers Corp.*,

517 U.S. 308 (1996). Nathan must therefore navigate the *McDonnell Douglas* burden-shifting

regime, which first requires that Nathan establish a prima facie case of discrimination. *Hill v.*

*Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004).

Under *McDonnell Douglas*, Nathan must produce evidence sufficient to establish "(1)

membership in a protected class; (2) satisfactory job performance; (3) adverse employment

action . . . ; and (4) that similarly-situated employees outside the protected class received more

favorable treatment." *Gerner v. Cnty. of Chesterfield*, 674 F.3d 264, 266 (4th Cir. 2012) (quoting

*White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004)). If that prima facie case is

established, the burden shifts to Takeda to provide a legitimate, nondiscriminatory reason for the

adverse employment action. *Hill*, 354 F.3d at 285. If Takeda can satisfy its burden of

production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence

that the employer's stated reasons 'were not its true reasons, but were a pretext for

discrimination.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 145

(2000)).

Nathan's discrimination claim constitutes a claim of "sex plus" discrimination, where

"discrimination is based on a combination of sex and a facially neutral factor." *Earwood v.*

*Continental Se. Lines, Inc.*, 539 F.2d 1349, 1351 (4th Cir. 1976) ("Under this theory, regulations

limiting employment of women with small children or who are married, but not restricting men

11

similarly situated, have been struck down."); *see also Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 543 (1971) (holding that it violates Title VII for an employer to have "one hiring policy for women and another for men—each having pre-school-age children."); *Samuels*, 2009 WL 3348134, at *5 ("A 'sex plus' theory of discrimination is based upon allegations that an employer disparately treated a subclass within a protected class."). In assessing the sufficiency of that claim, the Court will assume, without deciding, that Nathan is able to satisfy the first three elements of his prima facie case and focus on whether he has satisfied the fourth element—that similarly situated employees outside the protected class received more favorable treatment.[10]

Nathan's evidence as to this fourth element does not include any evidence of a "comparator," that is, a similarly situated person outside the protected class who was treated differently than Nathan. For example, there is no evidence that another employee without child-care responsibilities, male or female, was permitted to ignore Fouchie's start-time policy without consequences. Nor is there any evidence that a female employee with comparable child-care responsibilities was excused from complying with Fouchie's start-time policy or otherwise treated more favorably. *See* Pl.'s Opp'n 3 ("No other representative has claimed that childcare duties impacted their state time or field time."). In fact, the record evidence demonstrates that Fouchie did not *target* Nathan at all but rather attempted to enforce the start-time policy only against Nathan because as far as Fouchie knew only Nathan was not complying with it.[11]

---

[10] For the reasons discussed within the context of his hostile work environment claim and his retaliation claim, the Court has substantial doubts that, for the purposes of his discrimination claim, Nathan has established a prima facie case that he satisfactorily performed his job or was subjected to an adverse employment action.

[11] Nathan testified in his deposition that none of Fouchie's sales representatives complied with the start time, but that everyone *but Nathan* lied to Fouchie when asked whether they were complying with the 8:00 a.m. mandate. *See* Nathan Dep. 128-29.

The parties disagree as to whether the plaintiff must show a "comparator" to establish a prima facie case of sex plus discrimination.  Nathan argues that a comparator is not required in order to raise the inference that Nathan's child-care responsibilities motivated Fouchie's conduct and that it is sufficient for him to show evidence of "gender stereotyping."  On this basis, Nathan claims he has made a sufficient showing for a prima facie case based on Fouchie's asking Nathan on November 20, 2008 if his wife could take their children to school, coupled with the temporal proximity between Fouchie's inquiry on February 9, 2009 about his starting time and his telling Nathan that same day that he needed to be recertified as to Uloric.  *See* Pl.'s Opp'n 21 ("Under these circumstances, Nathan is not required to provide comparator data.").  Takeda contends, on the other hand, that a sex plus claim requires a comparator because, unlike certain other types of discrimination claims, a sex plus claim requires gender and another neutral factor together to form the basis for liability.  For this reason, Takeda claims that Nathan must show more than the fact that a male caregiver was not given an accommodation with respect to Fouchie's start-time policy or was generally treated poorly; rather, in order to raise an inference of discrimination based on his status as a *male* caregiver, he must show that a similarly situated female *was* given such an accommodation or *was* treated more favorably, all else being equal.  Only such a comparator, argues Takeda, would allow the inference, not otherwise reasonable, that Nathan was discriminated against on the basis of his gender.  Takeda also claims that the need for an appropriate comparator is particularly strong in this case because the record does show that a female employee caregiver was also subjected to the same start-time policy as Nathan. *See* Def.'s Ex. N, at ¶¶ 7-11 (pertaining to female employee L.C., who was (1) married to an attorney, like Nathan, (2) had a young child, (3) worked under Fouchie, and (4) was subjected to the same start-time requirements as Nathan).

The parties' disagreement as to whether a comparator is required stems, in part, from the Fourth Circuit's opinion in *Bryant v. Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545-46 (4th Cir. 2003). There, the Fourth Circuit explained that a plaintiff "is not required as a matter of law to point to a similarly situated white comparator in order to succeed on a race discrimination claim." *Id.* at 545. "We would never hold, for example, that an employer who categorically refused to hire black applicants would be insulated from judicial review because no white applicant had happened to apply for a position during the time frame in question." *Id.* at 545-46. Although the Fourth Circuit has not directly addressed the requirements of proving a "sex plus" claim, it has recently explained generally that a comparator is required to establish a prima facie claim of gender discrimination. *See Gerner*, 674 F.3d at 266 (holding that a prima facie claim requires a showing, among others, "that similarly-situated employees outside the protected class received more favorable treatment."). Other circuits have explicitly held that a comparator is required to establish sex plus discrimination. *See Coleman v. B-G Maintenance Mgmt. of Colo., Inc.*, 108 F.3d 1199, 1204 (10th Cir. 1997) (holding that "gender-plus plaintiffs can never be successful if there is no corresponding subclass of members of the opposite gender."); *see also Bryant v. Int'l Sch. Servs., Inc.*, 675 F.2d 562, 575 (3d. Cir. 1982) ("To prove their prima facie case appellants must produce evidence that similarly situated males were treated differently and that there was no adequate nonsexual explanation for the different treatment."). Other district courts in this Circuit have uniformly held that a comparator is required in "sex plus" discrimination cases. *See e.g., Jordan v. Radiology Imaging Assocs.*, 577 F. Supp. 2d 771, 785 (D. Md. 2008) (holding that a sex plus claim requires a comparator to establish a prima facie case); *Samuels*, 2009 WL 3348134, at *6 (same); *Hess-Watson v. Potter*, 703CV00389, 2004 WL 34833, at *2 n.4 (W.D. Va. Jan. 4, 2004) ("The 'sex plus' theory of discrimination does not

14

establish a new protected class, but merely allows a subgroup of an already protected class, in this case women, to establish a prima facie case of sex discrimination.").[12]

The Court concludes that Nathan is required to show a comparator to establish a prima facie claim, although, even under his own theory, he has failed to produce sufficient evidence of gender stereotyping. Here, there was in place a uniformly applied start-time policy and without an appropriate comparator, any inference that Nathan was discriminated against because of his child-care duties would be based on an impermissible degree of speculation. Because the record before the Court does not contain any evidence of an appropriate comparator, Nathan fails to establish a prima facie case of discrimination and his claim for discrimination fails as a matter of law.[13]

### B. Hostile Work Environment

Nathan also alleges that he was subjected to a hostile work environment. To make out a hostile work environment claim based on gender, "a plaintiff must show that the offending conduct (1) was unwelcome, (2) was because of [his] sex, (3) was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment, and (4) was imputable to [his] employer." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 331 (4th Cir. 2011) (quoting *Bonds v. Leavitt*, 629 F.3d 369, 385 (4th Cir. 2011)). The Court will assume that Nathan has established the first and fourth elements of his claim, *i.e.* that the conduct relied on by Nathan was "unwelcome" and that it was imputable to his employer, and therefore will only discuss the second and third elements of his claim.

---

[12] For this same reason, the Court in *Hess-Watson* also concluded, as does this Court, that *Bryant* is distinguishable in sex plus claims. *Hess Watson*, 2004 WL 34833, at *2 n.4

[13] Even if Nathan could establish a prima facie case, for the reasons stated in Section III.C.1 on retaliation, *infra*, Takeda has provided a nondiscriminatory reason for any adverse employment actions and Nathan is unable to demonstrate pretext for those actions.

With respect to the second element, "[a]n employee is harassed or otherwise discriminated against 'because of' his or her gender if, 'but for' the employee's gender, he or she would not have been the victim of the discrimination." *Ziskie v. Mineta*, 547 F.3d 220, 226 (4th Cir. 2008) (quoting *Smith v. First Union Nat'l Bank*, 202 F.3d 234 (4th Cir. 2000)). A plaintiff "'may prove sex-based discrimination in the workplace even though [he] is not subjected to sexual advances or propositions,' but can succeed only by showing that [he] 'is the individual target of open hostility because of [his] sex." *Id.* (quoting *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003)). And finally, "the evidence must allow a reasonable jury to conclude that [his] mistreatment was due to [his] gender." *Id.*

The Fourth Circuit has delineated what kind of conduct will and will not satisfy this causation requirement. Simply not getting along with others and "personality conflicts" are not enough. *Id.* ("Some persons, for reasons wholly unrelated to race or gender, manage to make themselves disliked."). Finding causation is particularly challenging where "most of the comments and behavior of which [a plaintiff] complains [were] not about sex." *Id.* at 227. For instance, calling a coworker a "moron," and failing to cooperate in common tasks can be classified as "hostile," but is a "far cry" from those cases of obviously sex-related conduct, such as where "a male soccer coach incessantly talked about his female players' sex lives and bodies" and "where male employees repeatedly demonstrated sexual practices on a mannequin in front of [a female employee]," *id.* (citing *Jennings v. Univ. of North Carolina*, 482 F.3d 686, 691-94 (4th Cir. 2007); *Ocheltree*, 335 F.3d at 328), or where the plaintiff is "subjected to repeated use of sexual epithets." *Id.* (citing *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184-86 (4th Cir. 2001); *EEOC v. Sunbelt Rentals*, 521 F.3d 306, 310-12 (4th Cir. 2008)). Moreover, no inference of sex-based animus is reasonable where a female employee claimed "that she received

16

inadequate coaching, had to do work over and over, was unreasonably required to work late the night of an office Christmas party, and did not have access to the same work opportunities as other managers." *Hawkins v. Pepsico, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000). In short, a reasonable jury must be able to see the "hostility as a product of gender animus rather than the kind of personality conflict that pervades many a workplace." *Ziskie*, 547 F.3d at 227.

Here, Nathan claims that the required connection between his status as a male caregiver and a hostile work environment can be inferred from the requirements imposed upon him for additional certification training on Uloric and Kapidex between February 9, 2009 and March 23, 2009 and the consequences that resulted from those requirements (such as the denial of his tuition reimbursement).[14] None of these actions, however, demonstrates any animus based on sex. Nathan clearly disagreed with Takeda's perception that he needed to receive additional training, Takeda's denials of certifications after extra training, and the evaluations of his work.

---

[14] The specific actions Nathan relies on are as follows:

(1) He was required to train at 7 am on February 12, 2009;
(2) He was required to ride along with Savant on March 4, 2009 and received a "false" negative coaching letter;
(3) He was required to be recertified on Kapidex and Uloric on March 9, 2009 and was failed on both;
(4) He was required to travel to Illinois for additional recertifications on March 11, 2009, and was failed on Uloric;
(5) He was required to ride along with Fouchie on March 16 and 17, and received an atypical false negative report;
(6) HR issued its "false" warning letter threatening termination on March 19, 2009;
(7) He was required to travel to New Jersey on March, 23, 2009 for another recertification on Uloric;
(8) He was denied his tuition reimbursement request for $4,200;
(9) He was denied promotional opportunities following the negative letters and evaluations.

Def.'s Br. 21-22 n.28.

But there is simply no competent evidence that would permit a jury to do more than speculate that the motive for Takeda's actions was based on Nathan's status as a male caregiver. In that regard, Nathan's hostile work environment claim, as his other claims, is based on the series of events that occurred after Fouchie placed Nathan on notice on November 20, 2008 that he intended to enforce his start-time policy and Takeda's requiring all of its employees to become proficient on Kapidex and Uloric. Neither the start-time policy nor the training requirement as to new drugs was itself improper, illegal, or "hostile." There is no evidence that either was enforced in a way that was sufficiently connected to any gender-based animus. In fact, in his follow-up email to Nathan on December 12, 2008, Fouchie specifically stated that Nathan could start late for issues such as a doctor's appointment for one of his children. *See* Nathan Dep. Ex. 7 ("I will support your reasonable requests. There are times when you need to start later and finish earlier. (i.e. Doctor and Dentist appointments or taking a child to doctor.)"). Not even the telephone call from Fouchie to Nathan on February 9, 2009, in which Fouchie asked whether Nathan had continued to delay the beginning of his work day, was tinged with any epithets or any other type of gender-based comments sufficient to infer the necessary causal link between any conduct and sex-based animus.[15] In short, there is no evidence that the recertification process was the result of gender-based animus.

As to the third element of his prima facie case, Nathan no doubt perceived his work environment as abusive. But "that perception must be reasonable." *Ziskie*, 547 F.3d at 227 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)). The reasonableness of a plaintiff's perception must be judged objectively "from the perspective of a reasonable person in the

---

[15] Nathan explained the February 9, 2009 exchange as follows: "[Fouchie] called me in the morning, asked me if that was still the arrangements, as far as child care, the start time, and I said yes." Nathan Dep. 127.

plaintiff's position." *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998)).  As a general proposition, there must be evidence sufficient "to transform an ordinary conflict" of an employer-employee relationship into an actionable claim of discrimination. *Hawkins,* 203 F.3d at 282 ("[L]egally sufficient evidence of discrimination is critical in the context of [a discrimination lawsuit].  Otherwise, supervisors . . . could not evaluate employees of a different race [or gender] without the prospect of a lawsuit. . . [W]ithout the freedom to criticize performance, an organization simply cannot function.").

In evaluating whether a work environment is sufficiently "severe and pervasive," the Fourth Circuit has identified a number of considerations.  The first concerns the relative power between the harasser and the victim. *Ziskie,* 547 F.3d at 227-28.  Here, the alleged harassers are Nathan's supervisors, a fact that support his claim.  The second inquiry concerns the actual conduct that the plaintiff alleges is hostile. *Id.* at 228.  The Fourth Circuit has provided examples of conduct that does and does not satisfy this element.  For example, conduct was deemed sufficiently hostile where a female plaintiff employee's coworkers went out of their way to mimic sex acts in front of her and she was questioned repeatedly about her sex life, was the target of frequent comments about her body and was subjected to demeaning epithets. *Id.* Conduct was not deemed sufficiently hostile where "employee interactions could sometimes assume a coarse or boorish tone," where mere profanity was common, and where there was an "occasional off-color joke or comment." *Id.* Were "such things the stuff of lawsuits, we would be litigating past sundown in ever so many circumstances." *Id.*  The evidence in this case, viewed most favorably to Nathan, in insufficient as a matter of law to establish that Nathan was

subjected to conduct that was, in fact, "severe or pervasive enough to create an abusive work environment."[16]

## C. Retaliation

Nathan also contends he was retaliated against for his complaints to HR and for his EEOC charge. To establish a prima facie case for retaliation, the plaintiff must prove three separate elements: (1) that he engaged in a protected activity; (2) that his employer took an adverse employment action against him; and (3) that there was a causal link between the two events. *EEOC v. Navy Federal Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005). Like a discrimination claim, if the plaintiff is able to make out a prima facie claim, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the adverse employment action. *Hawkins*, 203 F.3d at 278. If the defendant satisfies its burden of production, the burden shifts back to the plaintiff to prove, by a preponderance of the evidence, that the reason is pretext. *Id.*

Takeda concedes that Nathan's EEOC complaint filed on July 17, 2009 is protected activity, but disputes that Nathan's complaints to HR beginning on February 9, 2009 were protected activity because Nathan could not have reasonably believed that Takeda's conduct was unlawful. Takeda also disputes that Nathan suffered any adverse employment actions or,

---

[16] At oral argument, Nathan seemed to conflate his hostile work environment claim and his retaliation claim. *Van Gunten v. Maryland*, 243 F.3d 858, 869-70 (4th Cir. 2001), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006) (holding that "retaliatory harassment can constitute adverse employment action" and explaining that the same elements for a hostile work environment are applicable); Pl.'s Opp'n 22 n.29 ("Similarly, a retaliatory hostile work environment claim is established when the offending conduct is based upon Plaintiff's protected activity . . . and Nathan has also met this standard."). To the extent Nathan contends he was subjected to a hostile work environment because he complained to HR (a claim he makes in his briefing only in a footnote), that claim fails the "severe and pervasive" element for the reasons stated in Section III.B, and the causation element for the reasons stated in III.C.

alternatively, that any adverse employment actions he did suffer were casually related to any

protected activity. Finally, Takeda claims that, to the extent that Nathan has established a prima

facie case for retaliation, the legitimate nondiscriminatory business requirements inherent in

Fouchie's start-time policy and Takeda's rigorous training requirements on Kapidex and Uloric

rebut any prima facie case, and Nathan fails to adduce facts sufficient to establish that such

reasons were pretext for retaliation.

 With respect to the pre-EEOC complaints to HR, the Court concludes as a matter of law

based on undisputed facts that Nathan has failed to adduce facts sufficient to establish that he

engaged in protected activity. The Court also concludes as to the other elements of his prima

facie case, within the context of both his complaints to HR and the EEOC, that with one

exception, Nathan has failed to adduce facts sufficient to establish that he suffered an adverse

employment action because of any protected activity. The Court further concludes that any

prima facie case Nathan may have established has been rebutted by Takeda's legitimate,

nondiscriminatory reasons and Nathan has not adduced any facts sufficient to raise a reasonable

inference of pretext.

 1. Nathan's pre-EEOC Complaints to HR

 (a) Protected activity

 To establish that his complaints to HR constituted protected activity, Nathan does not

have to prove that he was complaining of conduct that was actually violative of Title VII; rather,

he must only show that he reasonably believed that the complained of conduct was unlawful. *See*

*Navy Federal*, 424 F.3d at 406 (explaining that Title VII "protects activity in opposition not only

to employment actions actually unlawful under Title VII but also employment actions an

employee reasonably believes to be unlawful."). Whether Nathan "reasonably believed" he was

opposing unlawful conduct is to be measured by an objective standard that is to be applied as a matter of law. *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 339 (4th Cir. 2006).

Nathan first complained to HR on February 9, 2009 following two conversations that day. In the first, Fouchie inquired as to whether Nathan was complying with his 8:00 a.m. start time;[17] in the second, Fouchie told Nathan that he needed additional training on Uloric. As perceived by Nathan, these calls substantiated unlawful gender discrimination when viewed within the context of his November 20, 2008 conversation with Fouchie, when Fouchie asked whether his wife could transport their child to school.

There is no evidence, other than Nathan's subjective belief, that prior to February 9, 2009, he was being targeted or treated differently than any other sale representative because of his role as a male caregiver; and Nathan's conversations on February 9, 2009 do nothing to create a reasonable inference of such animus. Nathan's first February 9, 2009 conversation with Fouchie was nothing more than Fouchie's confirming whether Nathan was complying with his start-time policy. His second call was restricted to telling Nathan that he was to receive further training on Uloric. Even if Fouchie's decision to impose additional training requirements was punishment for Nathan's start-time noncompliance, and there is insufficient evidence connecting the two, it was objectively unreasonable for Nathan to believe that he was being punished on the basis of his gender, as opposed to simply being punished for his admitted tardiness. Said differently, there is insufficient evidence that Fouchie's treatment of Nathan was based on Nathan's *reason* for his late start time (i.e. his caregiver duties) rather than the simple fact that he had adhered to his late start time. Moreover, Nathan had no reason to think that he was being singled out. He knew that in Fouchie's eyes he was the only sales representative that was not

---

[17] *See supra* note 15.

complying with the start-time policy because he knew that he was the only person who told Fouchie that he was not complying with his start-time requirements. Nathan Dep. 128-29. Finally, the substance of what Nathan was required to do was in no way gender based or reflective of gender stereotyping. There is no contention that he was subjected to job requirements that were not job related or not applicable to every other sale representatives. As Nathan learned from his own investigation, Fouchie applied his start-time policy without regard to gender or child-care responsibilities; and Nathan knew that all sales representatives had to demonstrate, to the satisfaction their supervisors, their competency to market Takeda's drugs. At its core, Nathan's claim appears to be that his competency with respect to Kapidex and Uloric was unfairly discounted and that he was unreasonably subjected to a prolonged and unjustified training program because of those unjustified judgments by his supervisors. The evidence, however, is insufficient to permit an employee in Nathan's position to reasonably believe that Fouchie, Savant, Flood, or anyone else at Takeda was wielding the start-time policy or the certification requirement to vindicate views of gender stereotyping or to give vent to gender animus. In fact, the record shows quite the opposite. In a meeting with Savant on February 20, 2009, Nathan admitted that there were "some things he didn't do well" during the training in Anaheim on February 2, 2009. *See* Nathan Dep. Ex. 11.[18] And, with respect to later complaints, the record shows that Takeda extended special considerations to Nathan in order to satisfy the certification requirement and to retain his job after the formal training program had been

---

[18] As previously mentioned, *supra*, there is no evidence that Nathan took issue with the substance of Savant's email to Smith (Exhibit 11) and in fact, Nathan in general terms confirmed its accuracy. *See* Nathan Dep. 151-70.

completed.[19] The Court therefore finds and concludes as a matter of law, based on undisputed facts, that Nathan's complaints to HR were not based on a reasonable belief that Takeda was discriminating against him; therefore, Nathan did not engage in protected activity when he complained to HR about the start-time policy and the training requirements that had been imposed on him.[20]

      (b) Adverse employment actions.

      To establish an adverse employment action in the context of a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington*, 548 U.S. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (DC. Cir. 2006)). With one exception, Nathan fails to adduce evidence sufficient to establish that he suffered any adverse employment actions after he complained to HR.[21] There was nothing adverse about requiring Nathan to

---

[19] This consideration included two additional training programs with Takeda's Specialty Training Program on March 11, 2009 in Chicago and again on March 23, 2009 in New Jersey.

[20] At the hearing held on June 1, 2012, but not in his briefs, Nathan claims that his complaints were objectively reasonable because he acted on the advice of counsel. The Court rejects this contention as a matter of law. First, Nathan procedurally failed to properly raise this contention. Second, Nathan fails to present facts sufficient to support such a contention. In that regard, Nathan fails to disclose whether and when he actually consulted with counsel about the events that caused him to complain to HR, what facts he disclosed to counsel, and what counsel's advice was.

[21] As an initial matter, any retaliation would need to have occurred after Nathan's supervisors learned of his complaint on approximately February 20, 2009. *See Dowe*, 145 F.3d at 657 ("Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case."). In that regard, Nathan claims he suffered the following adverse employment actions after Fouchie and Savant learned on February 20, 2009 that he had complained to HR:

comply with a nondiscriminatory start-time policy or participate in a rigorous training program

in order to market the drugs it was his job to promote.  The Court does find, however, viewing

the evidence most favorably to Nathan, that Nathan has adduced sufficient facts to establish that

he suffered an adverse employment action when Takeda issued its warning letter dated March

---

(1) on March 4, 2009 Fouchie's supervisor and Regional Sales Manager Savant did a "ride along" with Nathan and based on that "ride along" decided that Nathan needed to be recertified on both Kapidex and Uloric;

(2) on March 11, 2009, he was required to attend training in Chicago on both drugs and the Chicago trainer certified him on Kapidex, but not Uloric;

(3) on March 16 and 17, 2009, he was required to ride with Fouchie, which resulted in false negative field reports;

(4) on March 19, 2009, he received a warning letter from Fouchie, drafted by HR, advising him that unless he was successfully certified on Uloric, he would be terminated;

(5) on March 23, 2009, he was required to travel to New Jersey for training on Uloric, after which he was certified on that drug and retained in his job.

(6)Takeda denied his discretionary tuition reimbursements in May 2009 and August 2009, totaling about $8,600, for a part-time MBA program he was enrolled in;

(7) he received "decreased salary increases"; and

(8) as a result of his negative performance evaluations, he was not able to obtain job changes or promotions as easily as he would have been otherwise, although he admits that he never applied for a promotion and he in fact received all his scheduled salary increases and year-end bonuses.

Pl.'s Opp'n 28-29.  In addition, the Court has considered the following events as adverse employment action in connection with his retaliation claim based on his complaints to HR, even though they appear to be more connected to his retaliation claim based on the EEOC charge:

(1) issuing negative field reports by Venanzi with false statements of Nathan's performance in July and September 2009;

(2) issuing a negative performance review for Nathan in August 2010, full of false statements/negative ratings;

(3) reducing Nathan's salary increase after his August 2010 review;

(4) denying Nathan promotional opportunities following the negative letters/evaluations above.

Pl.'s Opp'n 29; *see also infra* note 24 (explaining that the September 2009 field report is not part of the record).

19, 2009, when considered with his allegations concerning the effect of that warning on his ability to obtain reimbursement for his tuition payments.[22]

### (c) Causation

To establish causation between the alleged protected activity and adverse employment action, Nathan must adduce "evidence from which a reasonable factfinder could conclude that a causal connection exists between the protected activity and the adverse action." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998). Like Nathan's other claims, there is no direct evidence of causation; and the sole basis for Nathan's causation claim is the temporal proximity between Fouchie's and Savant's learning on February 20, 2009 of Nathan's complaints to HR and the events that began on March 4, 2009 when Savant accompanied Nathan in a "ride along," on the basis of which Savant required Nathan to undergo recertification as to both Kapidex and Uloric. *See Dowe*, 145 F.3d at 657 ("[E]vidence that the alleged adverse action occurred *shortly* after the employer became aware of the protected activity is sufficient to 'satisfy the less onerous burden of making a prima facie case of causation.'")

---

[22] Takeda does not dispute that it has a tuition reimbursement policy but rather claims that it is a discretionary policy and that the withholding of benefits under that policy cannot be deemed an adverse employment practice, citing *Tyler v. Ipsat Island Inc.*, 245 F.3d 969, 972 (7th Cir. 2001). However, Takeda does not point to evidence in the record that supports the claim that the policy is discretionary. In any event, withholding discretionary benefits is not necessarily immune from attack as an adverse employment action within the context of a retaliation claim. *See Burlington*, 548 U.S. at 61-64 (explaining that an adverse employment action under a retaliation claim encompasses more conduct and has a lower threshold than an adverse action under a discrimination claim). With respect to Nathan's claim that he suffered adverse employment actions based on the withholding of "decreased salary increases," bonuses, or promotions, Nathan does not point to evidence in the record that establishes the particulars of what those benefits would have been, particularly since the record shows that he did not apply for a promotion and he has not adduced facts sufficient to show that such an application would have been futile. *See Brown v. McLean*, 159 F.3d 898, 902 (4th Cir. 1998) (explaining that a "failure to promote" claim requires a showing that the employee applied for a promotion and was denied or that an application would have been futile).

(quoting *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir.1989)) (emphasis in original and internal brackets omitted).   Under this standard, the events that occurred in July and September 2009 and August 2010 are too far removed in time from his complaints to HR to allow an inference of causality.   *See King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (explaining that a two-month delay between the protected activity and the adverse action is "sufficiently long so as to weaken the inference of causation."); *Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006) (finding that a period of three to four months between the complaint and the adverse employment action was "too long to establish a causal connection by temporal proximity alone.").   However, there is sufficient temporal proximity to support an inference of causation between his complaints to HR and the events during the period March 4 and March 23, 2009, and the later denial of tuition reimbursements.

(d) Takeda's legitimate nondiscriminatory reasons and pretext

Any prima facie case that Nathan can establish based on this record, including any inference of causation supported by temporal proximity, is completely rebutted by Takeda's legitimate nondiscriminatory reasons for the training requirements imposed on Nathan.   In this connection, all of Nathan's alleged adverse employment actions in March 2009, including his warning letter dated March 19, 2009, were related to his failure to demonstrate his proficiencies under a certification requirement that pre-existed his HR complaints.   Likewise, there are no facts that would raise a reasonable inference that the training requirements imposed on Nathan were anything other than reasonable, nondiscriminatory job requirements.   Savant's decision to require Nathan to undergo more training after the March 4 ride along as to both Kapidex and Uloric and Flood's decision in Chicago not to certify Nathan as to Uloric were all based on their personal observations of Nathan's actual or simulated on the job performance with respect to

these drugs.  There is also insufficient evidence in the record to support an inference that the

training requirements imposed on Nathan after February 20, 2009 were a pretext for retaliation.[23]

The only evidence that Nathan relies on to establish pretext is the temporal proximity between

his complaint and the recertification process.  But as the Fourth Circuit has stated, temporal

proximity alone, while perhaps sufficient to establish causation for the purposes of a prima facie

case, cannot create a sufficient inference of pretext.  *See Cerberonics*, 871 F.2d at 457 (holding

that temporal proximity by itself is insufficient to establish pretext).

> For the reasons stated above, the Court concludes as a matter of law based on undisputed

facts that Nathan has failed to establish a prima facie claim of retaliation base on the pre-EEOC

complaints to HR or, alternatively, that Takeda had legitimate nondiscriminatory reasons for any

of the alleged adverse employment actions and there is no factual basis in the record for Nathan

to claim that such reasons were pretext for discrimination.

>    2.  EEOC Retaliation

> In June 2009, Nathan, at his request, was assigned to his supervisor before Fouchie,

Michael Venanzi.  On July 17, 2009, Nathan filed an EEOC complaint based on the conduct of

Fouchie and Savant, following which Nathan claims he was retaliated against in the following

respects:

---

[23] The closest Nathan comes to claiming pretext is the following:

> [T]he record evidence supports Nathan's contention that Fouchie was criticizing Nathan
> because of his discriminatory animus and stereotypical views on gender roles and makes
> [Takeda's] reason suspicious in light of the circumstances. Especially where no woman
> in Fouchie's District was treated poorly, as Nathan was.

Pl.'s Opp'n 21 n.27.  The "record evidence" to support this claim is nothing more than Nathan's
subjective judgments and temporal proximity between his complaint and the training
requirements.

(1) In July 2009, Nathan received a negative field report from his new supervisor Venanzi.[24]

(2) In August 2009, Nathan was denied a tuition reimbursement for the semester ending in July 2009.

(3) A year later, in August 2010, Nathan was provided a negative performance evaluation from 2009, which Venanzi had prepared. The evaluation contained below expectation ratings and, according to Nathan, hindered Nathan's ability to seek promotions and caused Nathan to receive a smaller pay increase.

Pl.'s Opp'n 30.

Takeda does not dispute that Nathan's EEOC complaint was protected activity. Nathan fails, however, to establish any other element of his retaliation claims.

First, Nathan fails to establish as a matter of law retaliation based on Venanzi's report in July, 2009. The report is little more than a review of Venanzi's July ride along with Nathan that provides some constructive criticism as to how Nathan could improve some of his sales tactics. *See* Venanzi Dep. Ex. 5. It represents the kind of evaluation and feedback that is a common part of any employment relationship and cannot be considered conduct that "would have dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Hawkins*, 203 F.3d at 282 ("[W]ithout the freedom to criticize performance, an organization simply cannot function."). For these reasons, as a matter of law, it does not constitute an adverse employment action. Moreover, Nathan has failed to establish causation between Nathan's EEOC complaint and Venanzi's July, 2009 report. Even if one assumed temporal proximity between Nathan's

---

[24] Nathan claims he also received a negative field report in September 2009. *See* Pl.'s Opp'n 30. However, there is no citation to where in the record the Report is located and the Court was unable to locate the report in the record. The Court, therefore, has not considered Nathan's contention based on that Report.

EEOC charge and the report,[25] Venanzi's report is based on legitimate nondiscriminatory

reasons, the professional evaluation of Nathan; and Nathan has adduced no facts that would raise

an inference of pretext for sex-based animus.

Second, Nathan has failed to establish that the denial of his tuition reimbursement request

was in retaliation for his EEOC complaint. It is undisputed that pursuant to company policy

Nathan was not eligible for reimbursement because he had received the warning letter dated

March 19, 2009, three months before his EEOC complaint. See SUF 54. While the

consequences of the warning letter were felt after the EEOC complaint, the cause of those

consequences came before the EEOC complaint; and Takeda's decision to deny reimbursement

was in any event justified by Takeda's legitimate non-discriminatory reasons, as discussed

above.

Third, Nathan has failed to establish that his 2009 performance review was in retaliation

for his EEOC charge. It is undisputed that his score on that review was no different than his

previous scores and therefore the performance review cannot as a matter of law raise an

inference of an adverse employment action. Stipulation ¶ 8 (Nathan's final score on the 2009

review of "3" was the exact same score he received on all of his performance reviews at Takeda,

including those that predated any allegedly discriminatory conduct.) *See Young v. HP Enterprise

Servs., LLC,* 1:10–cv–1096, 2011 WL 3901881, at *5 (E.D. Va. Sept. 6, 2011) (holding that

"[r]eceiving the same performance rating before and after making an internal complaint is not a

materially adverse action."). Even if it were an adverse employment action, there is no evidence

that the report, issued over a year after the EEOC complaint, was somehow in retaliation to that

---

[25] Any permissible inference based on temporal proximity is substantially attenuated given that
Venanzi was not involved in any way with the alleged conduct that led to Nathan's EEOC
complaint.

complaint. *See King*, 328 F.3d at 151 n.5; *Pascual*, 193 F. App'x at 233; *Dowe*, 145 F.3d at 657 (explaining that "a lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two."). For these reasons, the Court finds that Nathan has failed to establish a prima facie case for retaliation with respect to his EEOC claim.

III.

For the above reasons, the Court concludes as a matter of law, based on undisputed facts, that Nathan has failed to establish a prima facie claim that Takeda violated Title VII of the Civil Rights Act of 1964, as alleged in his complaint. The Court will therefore grant Takeda's Motion for Summary Judgment and enter judgment on behalf of Takeda and against Nathan.

The Court will issue an appropriate Order.

The Clerk is directed to forward copies of this Memorandum Opinion to all counsel of record.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
August 24, 2012